UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

---

UNITED STATES OF AMERICA,                    No. 13-cr-70(2) (JRT/LIB)

v.                                            **REPORT AND RECOMMENDATION**

(2) Marc L. Lyons,

                Defendant.

---

        This matter came before the undersigned United States Magistrate Judge upon

Defendant's Motion to Dismiss, [Docket No. 106]; his Motion to Strike Surplusage, [Docket No.

107]; and his Motion to Suppress Statements, [Docket No. 114]. The case has been referred to

the Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1) and

Local Rule 72.1. The Court held a hearing on July 2, 2013, regarding the Defendant's motions

for discovery,[1] severance,[2] dismissal, and suppression. For the reasons outlined below, the Court

recommends the motions be **DENIED**.

## I.      BACKGROUND

        Marc L. Lyons ("Defendant") is an enrolled member of the Leech Lake Band of

Chippewa Indians, and is one of four persons charged with one count each of Transportation,

Sale and Purchas of Fish Taken in Violation of Tribal Law, in violation of 16 U.S.C. §§

3372(a)(1) and 3373(d)(1), and Leech Lake Band of Chippewa Indians Conservation Code §§

22.01(2) and 23.01. (Indictment [Docket No. 1] at 2-4). Defendant was indicted on April 9,

2013, and made the present motions on June 20, 2013. The Court held an evidentiary hearing on

July 2, 2013, and accepted evidence concerning the suppression motion; the parties were allowed

---

[1] Defendant's discovery motions were the subject of a separate Order. [Docket No. 136].
[2] Defendant's motion for severance was the subject of a separate Order. [Docket No. 145].

additional time for briefing, and both Defendant and the Government provided supplemental briefs. (See Docket Nos. 133, 136).[3] Defendant is presently scheduled to go to trial before the Hon. John R. Tunheim on September 23, 2013. (See Order [Docket No. 131]).

## II. DEFENDANT'S MOTION TO DISMISS [Docket No. 106]

Defendant Lyons was indicted as part of "Operation Squarehook," a collaborative effort among officials of the Federal Government, the Leech Lake Band of Chippewa Indians, the Red Lake Band of Chippewa Indians, and the State of Minnesota to investigate and prosecute illegal poaching and marketing of protected fish on the Leech Lake and Red Lake Reservations and in Beltrami, Cass, Clearwater, Itasca, Pennington, and Polk Counties.[4] Defendant Lyons is one of ten persons who were indicted in four separate Federal cases: United States v. Brown, No. 13-cr-68 (JRT/LIB); United States v. Reyes, No. 13-cr-70 (JRT/LIB); United States v. Bellefy, 13-cr-71 (RHK/LIB); and United States v. Good, 13-cr-71 (JRT/LIB) (collectively, the "Federal prosecutions").[5]

---

[3] In his Reply to the Government's Response, [Docket No. 133], Defendant does not limit himself to the dispositive motions at issue in this Report and Recommendation, for which the Court afforded the parties additional time for briefing, but he also attempts to re-argue one aspect of his Motion to Compel Attorney for the Government to Disclose Evidence Favorable to the Defendant. [Docket No. 109]. In particular, Defendant again asks the Court to order the Government to disclose evidence of whether and how it considered his alleged treaty rights in deciding to prosecute. (See Def.'s Reply to Gov't's Resp. at 5-6).

The Court previously denied this request in its Order concerning Defendant's discovery motions. (See Order of July 8, 2013 [Docket No. 136], at 3-5). Defendant has not made a request to the undersigned Magistrate Judge seeking reconsideration of that Order, and, therefore, the Court will not now entertain Defendant's request. The Court also notes that more than fourteen (14) days have passed since the Court issued its Order on Defendant's discovery motions, yet Defendant has not raised any objection to that Order to the District Court pursuant to Local Rule 72.2(a)(1).

[4] The Court takes judicial notice of the co-operative nature of the investigation among Federal, Tribal, and State agencies. See Press Release, U.S. Attorney's Office, District of Minnesota, Ten Indicted In Connection With Illegal Poaching of Walleye On Leech Lake And Red Lake (April 10, 2013), available at http://www.justice.gov/usao/mn/bellefy,etc.indicted.html (last viewed Aug. 7, 2013).

[5] In United States v. Brown, Defendant Michael D. Brown is identified in the Indictment as an enrolled member of the Leech Lake Band of Chippewa Indians; the Indictment does not indicate whether Defendant Michael J. Nei is an Indian.

In United States v. Reyes, Defendants Jerry A. Reyes, a/k/a/ "Otto Reyes," and Marc L. Lyons are identified in the Indictment as enrolled members of the Leech Lake Band of Chippewa Indians, and Defendant Frederick W. Tibbetts, a/k/a "Bud Tibbetts," is identified in the Indictment as an enrolled member of the White Earth Band of Chippewa Indians; the Indictment does not indicate whether Defendant Alan D. Hemme is an Indian.

Defendant here first argues that the Lacey Act does not apply to Indians. In the alternative, Defendant argues that, even if the Lacey Act applies to Indians, the Government's prosecution of him under the Lacey Act is invalid because the acts that the Indictment alleges he committed, even if true, would merely constitute the lawful exercise of his rights under the Treaty with the Chippewa, 7 Stat. 536 (July 29, 1837) (hereinafter, the "1837 Treaty"), and various other treaties. (See Docket No. 106).[6]

**1. The Lacey Act applies to Indians.**

Defendant argues that Congress never intended the Lacey Act to apply to Indians. The Court cannot agree with this argument, which is clearly contrary both to the plain language of the Lacey Act and to binding Eighth Circuit precedent. United States v. Big Eagle, 881 F.2d 539, 540 n.1 (8th Cir. 1989) (hereinafter "Big Eagle II") ("the Lacey Act, by its terms and definitions, applies to Indian people" (citing 16 U.S.C. § 3371(e) ("The term 'person' includes any individual . . . subject to the jurisdiction of the United States")). The Eighth Circuit's holding in Big Eagle II is consistent with the Ninth Circuit's decision in United States v. Sohappy. 770 F.2d 816 (9th Cir. 1985). Upon a review of the Lacey Act's legislative history, the Ninth Circuit held that Congress intended that the act apply to Indians:

> [T]he overall purpose in subjecting persons who traffic in illegally obtained fish to the stiffer Lacey Act penalties was to allow the Federal

---

The Indictment in United States v. Bellefy does not indicate whether Defendants Larry W. Bellefy, Thomas P. Sumner, or Brian Holthusen are Indians; however, Defendants Sumner and Holthusen identify themselves as enrolled members of the Red Lake Band of Chippewa Indians in their respective motions to dismiss for selective prosecution.

The Indictment in United States v. Good does not indicate whether Defendant Larry Good is an Indian; however, he identifies himself as an enrolled member of the Red Lake Band of Chippewa Indians in his motion to dismiss for selective prosecution.

[6] Seven of the ten defendants in the Federal prosecutions have moved for dismissal of the Indictment on the grounds that they were merely exercising their treaty rights, and at least some have sought to incorporate each other's arguments with regard to these motions. (See, e.g., United States v. Brown, No. 13-cr-68(1), Def.'s Supplementary Mem. Supp. Mot. Dismiss Indictment [Docket No. 69], at 1 ("We respectfully . . . join in the arguments filed on behalf of the Red Lake and Whtie Earth defendants in the 'Operation Squarehook' cases.").

Consequently, references in this Report and Recommendation to Defendant's arguments encompass not only those made by Defendant in the present case, but also to those made by defendants in the related cases.

Government to provide more adequate support for the full range of laws that protect wildlife.

Indians who traffic in illegal wildlife harm the Lacey Act's goal of wildlife preservation just as much as non-Indian traffickers. . . . To exempt Indians from these penalties would impede attainment of Congress' goal.

Id. at 821 (internal quotations, alternations, and citations to Congressional reports omitted).[7]

Defendant offers no authority—in particular, no binding Eighth Circuit or U.S. Supreme Court authority—to suggest that the Lacey Act does not apply to Indians. Therefore, the Court holds, consistent with Big Eagle II, that the Lacey Act does apply to Indians, and, consequently, that the Indictment is not facially improper.

### 2. The Government's prosecution of Defendant under the Lacey Act does not violate his treaty fishing rights.

Having determined that the Lacey Act applies to Indians, the Court next must determine whether the Government's prosecution of Defendant under the Lacey Act is improper as a punishment for the exercise of his right to fish, as guaranteed by treaties.

#### a. Standard of Review

"A prosecution designed solely to punish a defendant for exercising a valid legal right violates due process." United States v. Leathers, 354 F.3d 955, 961 (8th Cir. 2004) (citing Blackledge v. Perry, 417 U.S. 21, 25-26 (1974); United States v. Graham, 323 F.3d 603, 606 (8th Cir. 2003)). A defendant may demonstrate that he was prosecuted for an improper motive by either direct or circumstantial evidence. Id. (citing United States v. Beede, 974 F.2d 948, 951 (8th Cir. 1992)). However, "[i]t is the defendant's burden to show that the prosecution was brought in order to punish the defendant for the exercise of a legal right." Id. (citing United

---

[7] See also United States v. Big Eagle, 684 F. Supp. 241, 244 (D.S.D. 1988) ("The defendant next contends that the Court lacks subject matter jurisdiction to hear this action because the Lacey Act does not apply to Indians. The only United States Court of Appeals to decide this issue has held that the Lacey Act does apply to Indians. This Court is persuaded that the decision of the Ninth Circuit in United States v. Sohappy is correct and that the discussion of the issues raised in Sohappy is dispositive for purposes of deciding this motion" (citations omitted).).

States v. Kriens, 270 F.3d 597, 602 (8th Cir. 2001)). The Eighth Circuit has repeatedly described the Defendant's evidentiary burden in proving an improper motive for prosecution as "a heavy one." Id. (citing United States v. Kelley, 152 F.3d 881, 885-86 (8th Cir. 1998)).

### b. Discussion

The Court begins with the issues that are not in dispute. First, in the present case, neither party disputes that the Chippewa Indians[8] in Minnesota generally have a right to fish on tribal land and within the territory ceded pursuant to the 1837 Treaty. "As a general rule, Indian tribes have 'the power to manage the use of their territory and resources both by members and nonmembers.'" United States v. Big Eagle, 684 F. Supp. 241, 245 (D.S.D. 1988) (hereinafter "Big Eagle I") (citing New Mexico v. Mescalero Apache Tribe, 462 U.S. 324, 335 (1983), aff'd Big Eagle II, 881 F.2d 539 (8th Cir. 1989), reh'g denied 1989 U.S. App. LEXIS 13872 (8th Cir. Sept. 8, 1989) (en banc), cert. denied 493 U.S. 1084 (1990). "Although some treaties provide expressly that Indians have exclusive hunting, fishing, and gathering rights on their reservations, it is not necessary that the rights be referred to as "exclusive" in the treaty, or even that they be expressly mentioned. Exclusive on-reservation hunting, fishing, and gathering rights are implied from the establishment of a reservation for the exclusive use of a tribe, whether the reservation was set aside by executive order, statute, agreement, or treaty." 1-18 Cohen's Handbook of Federal Indian Law § 18.03 (footnotes omitted). "Such treaty rights can be asserted by . . . an individual member of the Tribe." United States v. Dion, 476 U.S. 734, 738 n.4 (1986).

Additionally, although Defendant Lyons argues that his prosecution under the Lacey Act is a violation of his treaty rights, Defendant *does not challenge* the Leech Lake Conservation Code sections that constitute the predicate offenses for his Lacey Act prosecution, nor does he challenge the application of those Code sections to him. For Defendant Lyons: In fact,

---

[8] Also known as Ojibwe or Anishinabe.

Defendant at least implicitly acknowledges tribal authority to regulate fishing within its territorial jurisdiction.  (Mot. Dismiss Indictment [Docket No. 106], at 3 ("[I]sn't the proper remedy for a netting violation venued in the tribal court?  Yes.").

Finally, in the present case neither party disputes that the Lacey Act is a Federal statute of general applicability.  Both Defendant and the Government acknowledge that "'federal laws of general applicability 'are applicable to the Indian unless there exists some treaty right which exempts the Indian from the operation of the particular statutes in question.'"  United States v. Wadena, 152 F.3d 831, 846 (8th Cir. 1998) (quoting Sohappy, 770 F.2d at 819 (9th Cir. 1985) (quoting, in turn, United States v. Burns, 529 F.2d 114, 117 (9th Cir. 1975))).  If a court determines that there is a treaty right that exempts Indians from the operation of a Federal statute of general applicability, the court next asks whether that treaty right was abrogated by Congress. A court generally will find that Congress has abrogated a treaty right only where there is explicit statutory language doing so.  Dion, 476 U.S. at 738-39 (collecting cases).

The first question, then, is not, as Defendant urges, whether the Lacey Act abrogates his treaty right to take fish on the Leech Lake Reservation—a right that the Government acknowledges Defendant has.  Rather, the Court must begin with this question: Does Defendant's treaty right exempt him from the operation of the Lacey Act?

      **i.   The case law, both in the Eighth Circuit and elsewhere, supports the Government's assertion that Defendant's treaty right to fish does not exempt him from operation of the Lacey Act.**

           **(a) Sohappy and Stone**

The Ninth Circuit, in Sohappy, was the first court to address this question in detail, and it found that the defendants' treaty rights *did not* exempt them from the operation of the Lacey Act. 770 F.2d at 820.  The defendants in Sohappy were convicted of violating the Lacey Act by

catching and selling fish in violation of tribal and state law.  Id. at 817.  They appealed, arguing "that federal prosecution of Indians for violations of tribal fishing law violates Indian sovereignty and Indian treaty reserved fishing rights."  Id.

The Ninth Circuit rejected those arguments.  With regard to the argument that a Lacey Act prosecution would violate Indian tribal sovereignty, the court held that "Indian sovereignty is necessarily limited and must not conflict with the overriding sovereignty of the United States." Id. at 819 (internal citation and quotation omitted).  Additionally, the court held that a Lacey Act prosecution does not impair Indian tribal sovereignty, but rather "supports tribal laws by authorizing federal penalties for violations."  Id. at 819-20.  Furthermore, it held that a Lacey Act prosecution does not violate reserved fishing rights because "the Indians do *not* have any treaty reserved right to exercise *exclusive* jurisdiction over such fishing matters.  Nor is there "specific language [in the treaties] . . . 'purporting to exempt Indians from the laws of general applicability throughout the United States.'"  Id. at 820 (quoting Burns, 529 F.2d at 117 (emphasis and alterations in Sohappy).

The Eighth Circuit expressly adopted this reasoning, albeit not in a Lacey Act case, in United States v. Stone. 112 F.3d 971 (8th Cir. 1997).  In Stone, the defendant, an enrolled member of the White Earth Band of Chippewa Indians, was convicted of violating the Airborne Hunting Act[9] on the White Earth Indian Reservation.  112 F.3d at 972.  He appealed, arguing in part that "the treaties between the Chippewa Indians and the United States vested the tribes with jurisdiction over hunting, fishing and wild rice gathering and that therefore he cannot be federally prosecuted for hunting on the reservation."  Id. at 973.  The Eighth Circuit, citing

---

[9] 16 U.S.C. § 742j-l.

Sohappy with approval, rejected this argument:

> As the Ninth Circuit pointed out, however, despite the fishing rights contained in a treaty, "Indians do not have any treaty reserved right to exercise exclusive jurisdiction over such fishing matters." United States v. Sohappy, 770 F.2d 816, 820 (9th Cir. 1985) (upholding federal jurisdiction over an Indian on the reservation under federal statute criminalizing transporting, selling, or acquiring fish). "Indian sovereignty is 'necessarily limited' and must not conflict with the overriding sovereignty of the United States." Id. at 819. Federal laws of general applicability "are applicable to the Indian unless there exists some treaty right which exempts the Indian from the operation of the particular statutes in question." Burns, 529 F.2d at 117; Sohappy, 770 F.2d at 820 (quoting Burns, 529 F.2d at 117). . . . [A]s in Sohappy, federal jurisdiction under the Airborne Hunting Act is not "disruptive of tribal authority, for rather than overturning basic tribal regulations, it supports the tribal laws by authorizing federal penalties for violations," and its enforcement against an Indian on Indian land is proper. Id. at 819-20.

Stone, 112 F.3d at 973-74.

Defendant argues that neither Sohappy nor Stone controls the present case. First, Defendant argues that Sohappy is inapplicable, because the treaty at issue in that case provided for a tribal "right to take fish at all 'usual and accustomed places' [which] was not exclusive but was to be shared 'in common with the citizens of the Territory.'" 770 F.2d at 819. In contrast, Defendant argues that the Chippewa Indians retain exclusive fishing rights on their reservations.[10] Defendant misses the point. The issue described by the court in Sohappy was

---

[10] Defendant's Counsel, in arguing that the Leech Lake Band has the exclusive right to regulate fishing on its reservation, misstates the holding in a previous District of Minnesota case. Counsel, quoting Leech Lake Band of Chippewa Indians v. Herbst, 334 F. Supp. 1001 (D. Minn. 1971), writes that the District Court "found, as well, that 'the Leech Lake Band possesses the exclusive authority to regulate fishing, hunting and ricing.'" (Def.'s Reply Supp. Mot. Dismiss [Docket No. 133], at 3 (quoting Herbst, 334 F. Supp. at 1006 (emphasis added by Counsel)); see also Def.'s Mot. Dismiss [Docket No. 106], at 3 (quoting the same passage, but without added emphasis)). In fact, the District Court **expressly rejected** that argument—**as demonstrated by the disclaimer which immediately precedes the passage quoted by Counsel**:

> The Leech Lake Band *suggests* that it has the exclusive right to regulate hunting and fishing of Indian and non-Indian alike on the reservation the same as the Minnesota Red Lake Indians do and cites Williams v. Lee, 358 U.S. 217 (1959), and Littell v. Nakai, 344 F.2d 486 (9th Cir. 1965), as authority for the position.
> But the Red Lake Indians of Minnesota and the Navajo Indians of Arizona, whose rights were determined in Williams and Littell, are governed by different treaties, have enjoyed different relationships to the government, and have been the subject of different expressions of Congressional policy. The Red Lake and Navajo Indians live on "closed" reservations. The Leech Lake Chippewa live on an "open"

whether the treaty reserved exclusivity as to "*jurisdiction over enforcement* of tribal fishing law against Indians." 770 F.2d at 818. Defendant has provided no evidence of any treaty language, or any other authority, that reserves to the Chippewa Indians exclusive jurisdiction—to the exclusion of the United States—over enforcement of on-reservation fishing regulations.

Defendant also argues <u>Stone</u> is inapplicable because it did not concern fishing rights. The Court is not persuaded. Although Stone was prosecuted for a hunting violation and not a fishing violation, the defendant's argument in that case was substantially the same as the Defendant's argument in the present case: that his Federal prosecution violated the usufructuary rights he was guaranteed by one or more treaties. Defendant offers no reason, and the Court can think of none, that the distinction between hunting and fishing would be material.

### (b) <u>Big Eagle I</u> and <u>II</u>.

Three years after the Ninth Circuit decided <u>Sohappy</u>, the U.S. District Court for the District of South Dakota denied a motion to dismiss that raised substantially the same questions at issue in the present case. In <u>Big Eagle I</u>, the defendant was an enrolled member of the Crow Creek Sioux Tribe, and was charged with a Lacey Act violation, the predicate offense being a violation of the fishing regulations contained in the Lower Brule Sioux Tribe's Wildlife Management Code. 684 F. Supp. at 242-43. The defendant argued that the Fort Laramie Treaty of 1868, 15 Stat. 635 (Apr. 29, 1968), guaranteed him a right to fish where he did. 684 F. Supp. at 244. The court concluded that the exercise of such a right could be regulated either by lawfully enacted tribal regulation, or by its explicit abrogation under Federal law. <u>Id.</u> at 246

---

reservation. ***Here I am not persuaded that***, as in <u>Williams</u> and <u>Littell</u>, the conclusion is compelled that ***the Leech Lake Band possesses the exclusive authority to regulate fishing, hunting and ricing***. <u>Herbst</u>, 334 F. Supp. at 1006 (emphasis added).

The Court presumes that Counsel's gross misrepresentation of <u>Herbst</u> was merely the result of inattention to detail, as Counsel surely knows that "[a] lawyer shall not knowingly: (1) make a false statement of fact or law to a tribunal . . . ." Minn. R. Prof'l Conduct, R. 3.3(a)(1).

("Neither the Lacey Act nor the Lower Brule Wildlife Management Code 'takes away the rights of Indians to fish in the Missouri River,' as the defendant argues. Rather, Indians retain the right to fish in accordance with tribal regulations except as these rights may be expressly abrogated by federal law.").

Upon a review of various Sioux treaties, the Court concluded that those treaties "may be construed to authorize regulation of fishing by the Indians within each reservation," and that various Sioux tribes (including the Lower Brule) had enacted "their own fishing regulations. <u>Id.</u> at 245. Because the Lower Brule Sioux Tribe had enacted regulations governing the exercise of treaty rights within the Lower Brule Reservation, and because those regulations governed the defendant's actions, and because the defendant's violation of those regulations precipitated his prosecution under the Lacey Act, that prosecution did not constitute a *Federal* abrogation of his treaty rights. <u>Id.</u> at 244-46.[11]

### (c) Defendant presents <u>no</u> case law in which a court has held that an Indian's treaty rights exempt him from operation of the Lacey Act.

Defendant presents no authority, and this Court has found none, holding that an Indian's treaty rights exempt him from operation of the Lacey Act. Instead, Defendant relies on cases that only generally address tribal usufructuary rights and cases holding that certain Federal prosecutions under acts other than the Lacey Act abrogated Indian treaty rights.

Defendant does not specifically address the rationale of <u>Big Eagle I</u>, but instead argues that <u>Sohappy</u>, <u>Stone</u>, and <u>Big Eagle</u> (presumably both <u>I</u> and <u>II</u>) were effectively reversed by the U.S. Supreme Court's decision in <u>Minnesota v. Mille Lacs Band of Chippewa Indians</u>, 526 U.S. 172 (1999). However, <u>Mille Lacs</u> has no bearing on the present case, for two reasons: First, <u>Mille Lacs</u> did not, as Defendant suggests, expand the Indians' *on-reservation* usufructuary

---

[11] Although the Eighth Circuit did not specifically address this argument in <u>Big Eagle II</u>, it did affirm the District Court's denial of the defendant's motion to dismiss.

rights that were addressed in Stone, but instead confirmed that the Chippewa Indians reserved rights to hunt, fish, and gather *off-reservation* in the "ceded territory." 526 U.S. at 204. Defendant is charged with an on-reservation offense.[12] Thus, Mille Lacs does not apply.

Second, Mille Lacs held that treaties limited the *State's* authority to infringe Chippewa Indians' usufructuary rights—it says nothing about the *Federal Government's* authority to prosecute pursuant to a law of general applicability:

> [T]he 1837 Treaty gave the Chippewa the right to hunt, fish, and gather in the ceded territory *free of territorial, and later state, regulation*, a privilege that others did not enjoy. Today, *this freedom from state regulation curtails the State's ability to regulate hunting, fishing, and gathering by the Chippewa in the ceded lands*.

Id. (emphasis added). "The federal government can regulate fishing concurrently with the Indian tribes in the interest of conservation." Big Eagle, 684 F. Supp. at 244 (citing Sohappy, 770 F. Supp. at 819); see also Stone, 112 F.3d at 973-74.

Defendant also urges the Court to follow United States v. White, 508 F.2d 453 (8th Cir. 1974). In White, the defendant, a member of the Red Lake Band of Chippewa Indians, was seen shooting a bald eagle on the Red Lake Indian Reservation, and was charged with unlawful taking under the Bald and Golden Eagle Protection Act (the "BGEPA"), 16 U.S.C. § 668(a). White, 508 F.2d at 454. The District Court dismissed on the grounds that the defendant was legally exercising his treaty guaranteed right to hunt on the reservation, and the Eighth Circuit affirmed on the same grounds. Id. at 454, 457. In particular, the Eighth Circuit held that Congress, in enacting the BGEPA, had not explicitly abrogated Indian treaty rights to hunt eagles and, therefore, that Defendant was legally exercising his hunting right.

---

[12] The Indictment alleges that Defendant violated the Leech Lake Conservation Code; thus, he is charged under the Lacey Act for an alleged violation of "Indian tribal law." See 16 U.S.C. § 3372(a)(1). The Lacey Act "Indian tribal law" provision applies only to conduct "within Indian country defined in section 1151 of title 18." 16 U.S.C. § 3371(c).

However, prosecution under the BGEPA, unlike the Lacey Act, is not premised upon a predicate violation of a tribal wildlife law. Thus, in <u>White</u> the court was presented only with the question of whether the BGEPA abrogated the defendant's treaty right.

In the present case, the Court need not reach the question of whether Defendant's treaty right to fish was abrogated by the Lacey Act, because the Court finds that the Leech Lake Band's Conservation Code legitimately limits the scope of this right, such that Defendant's right to fish does not excuse him from the operation of the Lacey Act. <u>See</u> <u>Wadena</u>, 152 F.3d at 846 (Federal statute of general applicability applies to Indians unless treaty right *excuses them from operation of the statute*, or the right has been explicitly abrogated).

### ii. Summary

"Tribal wildlife laws are *per se* valid against tribe members." <u>United States v. Williams</u>, 898 F.2d 727, 729 (9th Cir. 1990); <u>see also</u> <u>Big Eagle I</u>, 684 F. Supp. at 244-46. In fact, Defendant does not challenge the authority of the Leech Lake Band's Conservation Code. Thus, it is the Conservation Code that specifies how Defendant may exercise his right to fish. Additionally, "the exercise of federal jurisdiction under the Lacey Act . . . supports tribal laws by authorizing federal penalties for violations." <u>Sohappy</u>, 770 F.2d at 819-20; <u>see also</u> <u>Big Eagle I</u>, 684 F. Supp. at 244 ("[t]he federal government can regulate fishing concurrently with the Indian tribes in the interest of conservation").[13] Defendant's attempts to distinguish <u>Sohappy</u>, <u>Stone</u>,

---

[13] Defendant argues that, under <u>United States v. Jackson</u>, 600 F.2d 1283 (9th Cir. 1979), the federal government lacks the authority to prosecute a violation of a tribal wildlife ordinance. However, <u>Jackson</u> is easily distinguished from the present case, as the nature of the federal statute at issue in <u>Jackson</u> is very different from the Lacey Act. In <u>Jackson</u>, the prosecution was brought under 18 U.S.C. § 1165, "which provides:
> Whoever, without lawful authority or permission, willfully and knowingly goes upon any land that belongs to any . . . Indian tribe, . . . for the purpose of hunting, . . . shall be fined not more than $200 or imprisoned not more than ninety days, or both, and all game, fish, and peltries in his possession shall be forfeited.

<u>Jackson</u>, 600 F.2d at 1284 (quoting 18 U.S.C. § 1165). Thus, in <u>Jackson</u>, the defendant, who was an enrolled member of the Confederated Tribes of the Umatilla Reservation, was in essence charged with a trespass upon Indian land—an Indian-on-Indian crime. The <u>Jackson</u> court held that "in the absence of an explicit Congressional

and Big Eagle are unavailing. Therefore, applying the reasoning in those cases, the Court finds that although Defendant generally has a right to fish guaranteed by the various Chippewa Indian treaties, that right is (1) subject to lawful regulation by the Chippewa Indian tribes, and (2) the Federal Government has concurrent jurisdiction with regard to enforcement of tribal wildlife regulations affecting that right.

Accordingly, Defendant's treaty right does not exempt him from the operation of the Lacey Act and its incorporation of tribal wildlife law. Because Defendant's treaty right does not exempt him from the operation of the Lacey Act, a Federal statute of general applicability, the Court need not determine whether Congress explicitly abrogated that treaty right. See Wadena, 152 F.3d at 846.

While "[a] prosecution designed solely to punish a defendant for exercising a valid legal right violates due process," Leathers, 354 F.3d at 961, in the present case, Defendant has not met his burden of showing that the right he asserts—his treaty-based right to fish on the Leech Lake Indian Reservation—exempts him from the operation of the Lacey Act. Consequently, the Court recommends that Defendant's Motion to Dismiss, [Docket No.106], be **DENIED**.

## III.   DEFENDANT'S MOTION TO STRIKE SURPLUSAGE [Docket No. 107]

Defendant asks the Court to strike from the Indictment Paragraphs 2 and 3, which describe Sections 22.01(2) and 23.01 of the Conservation Code of the Leech Lake Band of Chippewa Indians, and Paragraph 4, which describes the Lacey Act. (See Docket No. 107, at 1). Defendant argues that the jury should not be "permitted to conflate a violation of a local tribal

directive, Indian tribes have exclusive criminal jurisdiction over offenses committed by one Indian against another Indian." 600 F.2d at 1285.

By contrast, in the present case Defendant is not charged with committing an offense against another Indian, but instead is charged with committing an offense "against tribal law and federal law (through the Lacey Act's incorporation of tribal law) designed to preserve fishing opportunities of Indians *and* non-Indians." Sohappy, 770 F.2d at 819 (emphasis in original).

law with [a] Congressional statute," and incorporates by reference his argument, with regard to his Motion to Dismiss, that the Government has no authority to prosecute him for exercise of his treaty rights.

"A motion to strike surplusage from an Indictment is a matter within the Court's discretion." United States v. Edwards, No. 07-cr-297 (DWF/JSM), 563 F. Supp. 2d 977, 1015 (D. Minn. 2008) (Mayeron, M.J.) (citing United States v. Figueroa, 900 F.2d 1211, 1218 (8th Cir.1990), adopted by 563 F. Supp. 2d 977, 984 (D. Minn. 2008) (Frank, J.).  However, "'[a] motion to strike surplusage from an indictment . . . should be granted only where it is clear that the allegations contained therein are not relevant to the charge made or contain inflammatory and prejudicial matter.'" Id. (quoting United States v. Michel-Galaviz, 415 F.3d 946, 948 (8th Cir. 2005) (quoting, in turn, Dranow v. United States, 307 F.2d 545, 558 (8th Cir. 1962))).

In the present case, Defendant has offered no cogent reason to strike Paragraphs 2, 3, or 4.  These paragraphs do not contain irrelevant or inflammatory "allegations," but instead they describe the Federal statute he is charged with violating, and the predicate offenses under Tribal law that form the basis of that Federal charge.  The elements of the offense charged set forth in the indictment are not "surplusage."[14]  Because the descriptions of these Tribal and Federal code provisions are material issues in the case, the Court recommends that Defendant's Motion to Strike Surplusage, [Docket No. 107], be **DENIED**.

## IV. DEFENDANT'S MOTION TO SUPPRESS STATEMENTS [Docket No. 114]

Defendant asks the Court to suppress the oral statements that he made to law enforcement on July 23, 2011, and the statement written out by one of those officers that Defendant signed.

---

[14] "'Frivolous motions should not be brought.'" Untied States v. Edwards, 563 F. Supp. 2d 977, 995 (D. Minn. 2008) (Erickson, M.J.) (quoting Rodriguez v. Young, 906 F.2d 1153, 1161 n.3 (7th Cir. 19990)); adopted by 563 F. Supp. 2d 977, 984 (D. Minn. 2008) (Frank, J.); see also Rodriguez v. Young, 708 F. Supp. 971, 982 (E.D. Wis. 1989) ("a defense attorney has an obligation not to bring frivolous motions"), aff'd 906 F.2d 1153 (7th Cir. 1990).

(See Docket No. 114). Defendant concedes that he was not in custody when those statements were made, but argues instead that the statements were not "voluntarily rendered." (Id.)

## A. Facts[15]

On July 23, 2011, at approximately 8:20 a.m., U.S. Fish and Wildlife Service Special Agent James Persson ("SA Person") and Minnesota Department of Natural Resources Lieutenant Todd Kanieski ("Lt. Kanieski") (together, the "interviewing officers") arrived at Defenant's home in Bena, Minnesota.[16] SA Persson testified that he was armed, but that his sidearm likely was not visible beneath his U.S. Fish and Wildlife Service jacket. He testified that Lt. Kanieski and the other officers wore standard duty belts, and that their sidearms likely were visible, but that he did not recall seeing that anyone ever drew a sidearm.

Defendant greeted the interviewing officers from his front steps, and SA Persson and Lt. Kanieski identified themselves as law enforcement officers and asked Defendant if they could speak with him. Defendant agreed, and invited them inside, where the three of them sat at Defendant's kitchen table. SA Person began by telling Defendant: "You are not under arrest, at the conclusion of our meeting I am not going to place you under arrest, and you are free to stop the interview at any time."

The interview continued for approximately 3 hours and 45 minutes, during which time Defendant was never physically restrained. The interviewing officers allowed him to change his clothes, to smoke, and to use the restroom. During the course of the interview, Defendant joked with the interviewing officers about a variety of topics, including the price of leeches, an

---

[15] The facts in this Part are derived from the testimony of James Persson, Special Agent with the U.S. Fish and Wildlfe Service, and from **Government's Exhibit 1**: A compact disc that contains two (2) separate recordings from the interview that he and Lieutenant Todd Kanieski, of the Minnesota Department of Natural Resources, conducted with Defendant on July 23, 2011, which the Government offered, and the Court accepted into evidence, for the purposes of this motion.

[16] In addition to SA Persson and Lt. Kanieski, three other law enforcement officers were present to assist with the execution of search warrants. Members of Defendant's family and a friend of Defendant were also present in the home.

associate's scheme to sell crawfish, their advancing age, whether "gay people" fish, allergies, and the perils of trying to stop smoking. The interviewing officers never raised their voices, never threatened Defendant, and made him no promises. Defendant never asked to speak with an attorney, and although he occasionally sounded frustrated by both the length of the questioning and by the subject matter, Defendant never indicated that he wanted the interview to end.

At the conclusion of the interview, SA Persson wrote out a statement summarizing the interview. SA Persson read that statement to Defendant, who confirmed that the statement was accurate, and that he did not wish to add anything to the statement. Defendant then initialed the form without making any changes.

## B. Standard of Review

"[Miranda] prohibits the government from introducing into evidence statements made by the defendant during a custodial interrogation unless the defendant has been previously advised of his [F]ifth [A]mendment privilege against self-incrimination and right to an attorney." United States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005) (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)). Miranda warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way." Stansbury v. California, 511 U.S. 318, 322 (1994) (quoting Miranda, 384 U.S. at 444). However, law enforcement officers "are not required to administer Miranda warnings to everyone whom they question." Oregon v. Mathiason, 429 U.S. 492, 495 (1977). "Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him in custody." Id.

"Whether or not <u>Miranda</u> is implicated, the Supreme Court has recognized that, in order for a confession to be admitted into evidence, it must be voluntary if it is to satisfy the Fifth Amendment's right against self-incrimination." <u>United States v. Pankey</u>, No. 07-cr-214, 2007 U.S. Dist. LEXIS 86785, at *11 (D. Minn. Oct. 25, 2007) (DWF/RLE) (Erickson, C.M.J.) (citing <u>Dickerson v. United States</u>, 530 U.S. 428, 433-34 (2000)), <u>adopted by</u> 2007 U.S. Dist. LEXIS 84319 (D. Minn. Nov. 13, 2007) (Frank, J.).  When analyzing voluntariness, the Court considers "whether a defendant's will was overborne by the circumstances surrounding the giving of a confession." <u>Dickerson v. United States</u>, 530 U.S. 428, 434 (2000).  Furthermore, a statement is involuntary if it "was extracted by threats, violence, or . . . promises, such that the defendant's will was overborne and his capacity for self-determination critically impaired." <u>United States v. Gallardo-Marquez</u>, 253 F.3d 1121, 1123 (8th Cir. 2001) (quotations and citations omitted).  Whether a defendant's will has been overborne is determined by looking at the totality of the circumstances, including both the conduct of law enforcement in exerting pressure to confess on the defendant and the defendant's ability to resist that pressure.  <u>United States v. Pierce</u>, 152 F.3d 808, 812 (8th Cir. 1998).  Courts consider a multitude of factors including the age of the defendant, the level of education of the defendant, the lack of advice to the accused on his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment.  <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 226 (1973); <u>see also</u> <u>United States v. Brave Heart</u>, 397 F.3d 1035, 1041 (8th Cir. 2005) (stating that "officers elicit confessions through a variety of tactics, including claiming not to believe a suspect's explanations, making false promises, playing on a suspect's emotions, using his respect for his family against him, deceiving the suspect, conveying sympathy, and even using raised voices. . . .  None of these tactics render a confession involuntary, however, unless the overall

impact of the interrogation cause the defendant's will to be overborne" (quotations and citation omitted).).

## C. Discussion

Based on the present record in this case, the totality of the circumstances indicates that Defendant's will was not overborne nor was he coerced by law enforcement during the interview that took place in his house on July 23, 2011, and that both his written and oral statements were therefore voluntary.

Defendant's Counsel acknowledges that, in order for the Court to find that his statements were involuntary, "[t]here must be *evidence* the defendant's 'capacity for self-determination' is constrained." (Reply at 6 (emphasis added by the Court) (citing United States v. LeBrun, 363 F.3d 715, 724 (8th Cir. 2004) (en banc), cert. denied 543 U.S. 1145 (2005)).[17] However, Defendant offers *no evidence or factual allegations* in support of his argument that Defendant's statements were involuntary. Defendant only states: "It's difficult to prove coercion. No law enforcement officer will admit to such a thing. It happens." (Reply at 7). Beyond this general statement, however, the Court has been given no evidence or reason to believe that "it happen[ed]" *in the present case*. Similarly, rather than cite to any binding (or even persuasive) legal authority, Defendant recommends to the Court merely a collection of scholarly reports regarding "false confessions," and only generally infers that he made such a "false confession" when interviewed on July 23, 2011. (Id.). Even if the Court was inclined to consider the non-authoritative recommended reading, the record remains lacking in any evidence, or even any

---

[17] In LeBrun, the district court held that "psychological pressure" applied by the interrogators, "when coupled with certain statements [the interrogators] made concerning nonprosecution, rendered LeBrun's confession involuntary." Id. The Eighth Circuit reversed, finding that the defendant's belief that he would not be prosecuted was "mistaken," and holding that even if his interrogators had promised not to prosecute him, "a promise made by law enforcement 'does not render a confession involuntary per se.'" Id. at 725 (quoting Simmons v. Bowersox, 235 F.3d 1124, 1132 (8th Cir. 2001)).

specific factual allegations whatsoever to suggest that Defendant's statements to law enforcement were involuntary.

Defendant, though, states: "Mr. Lyons had no discernable [sic] choice but to subject himself to the interrogation. The agent admitted that no choice was given. Mr. Lyons was not told that the interview could stop fifteen minutes into it." (Id. at 7-8). These statements, even assuming them to arguably be "factual allegations" (the first sentence is more of a mere legal conclusion), bear little actual resemblance to the evidence in the record.[18] Counsel does not identify (and the Court, in its review of the record, could not identify) anything said by SA Persson or Lt. Kanieski on the interview recordings or at the July 2, 2013, motions hearing, that could conceivably be construed as an admission that Defendant had "no choice" but to speak with the officers. Counsel's statement that Defendant was not told "fifteen minutes into" the interview that he could stop the interview, is technically correct (at the fifteen-minute mark, Defendant and the interviewing officers were discussing whether Defendant had a commercial license to sell fish); however, the implication that Defendant was not aware that he could end the interview is belied by the fact that SA Persson informed Defendant at the very outset of the interview that he was "free to stop the interview at any time."

---

[18] In lieu of providing the Court with facts and/or legal arguments, Defendant's Counsel instead uses both his Motion and his Reply to make hyperbolic rhetorical assaults upon the interviewing officers and the Government:

- Counsel describes the interviewing officers as "biased," (Mot. Suppress Statements [Docket No. 114], at 2); accuses them of "tunnel vision," "confirmation bias," and "sanctimony," (Reply at 8); and describes them as "skip[ping] out of the house victorious, thinking that no one would ever question what had happened or what was said," (Id.). Although Counsel cites generally to his scholarly tome's reference to "tunnel vision and confirmation bias," he offers **absolutely no factual allegations, nor any citations to or descriptions of the testimony or the evidence** to support these statements.
- Counsel chides the Government for being "predictable" by applying facts to the Eighth Circuit legal standard for coercive interviews, (Id. at 6), and describes the Government's arguments as "sophomoric" and "nonsense." (Id. at 6, 8).

Although Counsel has an "obligation to zealously protect and pursue a client's legitimate interests, within the bounds of the law," the Court reminds Counsel that he also has an obligation to do so "**while maintaining a professional, courteous, and civil attitude toward all persons involved in the legal system**." Minn. R. Prof'l Conduct, Preamble ¶ 9 (emphasis added).

Finally, the Court finds that, although the interview was lengthy, running approximately 3 hours and 45 minutes, it was not so lengthy as to militate a finding that it was coercive.[19] See, e.g., United States v. Czichray, 378 F.3d 822, 825, 830 (8th Cir. 2004) (interview in defendant's home lasting nearly seven hours was not custodial); Jenner v. Smith, 982 F.2d 329, 334 (8th Cir. 1993) ("The fact that the questioning extended for six or seven hours is not per se unconstitutionally coercive") (citing Sumpter v. Nix, 863 F.2d 563, 565 (8th Cir. 1988) (interview lasting seven-and-a-half hours not unconstitutional)).

Consequently, the Court recommends that the Defendant's Motion to Suppress Statements, [Docket No. 114], be **DENIED**.

## IV.     CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.  Defendant's Motion to Dismiss [Docket No. 106] be **DENIED**;

2.  Defendant's Motion to Strike Surplusage [Docket No. 107] be **DENIED**; and

3.  Defendant's Motion to Suppress Statements [Docket No. 114] be **DENIED**.

Dated: August 14, 2013                                         s/Leo I. Brisbois
                                                              LEO I. BRISBOIS
                                                              United States Magistrate Judge

## N O T I C E

During the briefing period following the July 2, 2013, motions hearing, upon the requests of both Parties, this Court extended the original time for both parties to prepare and file their briefs on these Motions.  Consequently, and in light of the pending trial date of September 23,

---

[19] This is especially so in the present case where Defendant requested and was permitted at various points during the interview to interrupt the questions, to change clothes, to use the restroom, and to take a smoke break.

2013, the Court now finds it must reduce the time that the parties are allowed to file, and to respond to, objections to this Report and Recommendation.

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties **by August 23, 2013**, a writing that specifically identifies the portions of the Report to which objections are made and the bases for each objection.  A party may respond to the objections within **seven days** of service thereof.  Written submissions by any party shall comply with the applicable word limitations provided for in the Local Rules.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  This Report and Recommendation does not constitute an order or judgment from the District Court, and it is therefore not directly appealable to the Court of Appeals.